THE HONORABLE LAUREN KING

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR22-013-LK |
| Plaintiff, | ) ) | DEFENSE SENTENCING MEMORANDUM |
| v. | ) ) | |
| JUSTIN CHRISTOPHER MOORE, | ) ) | |
| Defendant. | ) ) | |

Justin Moore, through Assistant Federal Public Defender Vanessa Pai-Thompson, respectfully recommends that the Court sentence him to five years of probation with a lengthy term of home detention or home incarceration.[1] The defense suggests *at least* twelve months[2] under home detention or incarceration. Home incarceration, in particular, achieves the same sentencing goals as incarcerating Mr. Moore in a Bureau of Prisons (BOP), without jeopardizing his physical and mental health and at a far reduced cost to the government. Incarcerating Mr. Moore in a BOP facility is unnecessary to serve any 18 U.S.C. § 3553(a) purpose.

---

[1] Home incarceration is far more restrictive than the home detention condition often imposed as part of pretrial and post-conviction supervision. The defense proposes the following language, taken from the U.S. Courts website, if the Court imposes home incarceration: "You are restricted to 24-hour-a-day lockdown at your residence, except for medical necessities and court appearances or other activities specifically approved by the court." (available at: https://www.uscourts.gov/services-forms/location-monitoring-probation-supervised-release-conditions).

[2] The defense arrives at this number based upon comparison cases discussed, *infra*. As Mr. Moore's letter reflects, he is prepared to abide by

---

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 1

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

## I. STATUTORY FRAMEWORK: SENTENCING MR. MOORE PROBATION MAINTAINS SENTENCING DISCRETION SHOULD HE FAIL TO COMPLY WITH SUPERVISION

Sentencing Mr. Moore to probation gives him a chance to continue to demonstrate that he has learned and changed through this case; it also provides a much stronger "stick" should he squander that chance. Imposing probation and home incarceration or detention, rather than the same period of BOP incarceration followed by a term of supervised release, maintains stronger Court power over Mr. Moore in two ways. First, it preserves the Court's power to resentence him bound only by the ten-year statutory maximum and guided by the 63–78-month advisory guideline range if he violates probation. 18 U.S.C. § 3565(a). For a supervised release violation, he could be sentenced to no more than two years in prison. 18 U.S.C. §§ 3583(e)(3) (two-year maximum for revocation where underlying crime is class C or D felony); 3559(a)(3); 26 U.S.C. §§ 5861(d) and 5845(a)(8). Additionally, any term of incarceration imposed for violating supervised release reduces the length of any new term of supervised release imposed as part of a revocation sentence. 18 U.S.C. § 3583(h).

Second, the Court can put Mr. Moore on probation much longer than it can put him on supervised release. The statutory maximum terms for probation and supervised release are five and three years, respectively. 18 U.S.C. § 3561(c)(1) (probation maximum); 18 U.S.C. § 3585(b)(2) (supervised release maximum).

## II. UNITED STATES SENTENCING GUIDELINES

The defense has no objections to the advisory guideline range outlined in the presentence report. The defense, government, and United States Probation all argue that a below-guideline sentence is appropriate for Mr. Moore—the only point of disagreement between the parties is how far below the advisory guideline range. Balancing the 18 U.S.C. § 3553(a) factors demonstrates that a probation sentence with

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 2

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

lengthy home detention or incarceration is sufficient. Imprisoning Mr. Moore is unnecessary at this point.

### III. ACHIEVING A SENTENCE THAT IS NO GREATER THAN NECESSARY—18 U.S.C. § 3553

#### A. Offense Seriousness & Circumstances; Deterrence; Public Protection

The defense recognizes that Mr. Moore's offense is serious. It is serious both in terms of the potential danger it created and because Mr. Moore's choices contributed to a period of chaos and destruction during Seattle's racial justice protests. Mr. Moore knows that Black Lives Matter wanted protests to remain peaceful and condemned the type of destruction to which he contributed. He is deeply ashamed that his actions harmed a movement about which he genuinely, deeply cares. Ex. 1 (Mr. Moore's letter to the Court). Mr. Moore's letter and a psychological evaluation he underwent describe in detail the depths of suicidal despondence in which he was mired when he committed his offense. *Id.*; *see also* Ex. 6, at 5-6 (Sealed Psychological Evaluation).

While certainly not an excuse for his offense, Mr. Moore's mental health at the time is a mitigating circumstance to it. Mr. Moore was despondent and wanted to die. He hoped that he would accomplish dying by suicide by provoking the police into killing him. Both Mr. Moore's letter and the psychological evaluation submitted with this memorandum address in detail the circumstances that contributed to his despair, his thinking during the offense, and treatment he has undergone while on pretrial supervision. Counsel thus does not repeat that information here. Mr. Moore's mental health history and current treatment and stability mediate against finding that imprisonment in a BOP facility is necessary to protect the public or deter him.

Mr. Moore has demonstrated since his offense that he can remain in the community safely under supervision. His current Pretrial Services Officer describes Mr. Moore's committed engagement with the supervision process:

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 3

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

> Mr. Moore was transferred to me in October 2022. Since that time, he has been extremely responsive, respectful, honest, and vulnerable about his needs and struggles. His overall adjustment to supervision was positive and he regularly made himself available for supervision. Furthermore, he consistently addressed his needs and engaged in various treatment programs to potentially mitigate any alleged risks.

Release Status Report, at 3. This description of Mr. Moore's approach to supervision and accepting help reflects counsel's own experience with him. Working through this case has required Mr. Moore to open up, repeatedly, about trauma he has endured and their ongoing impacts in his life. He has done so courageously. Throughout this process, Mr. Moore has demonstrated an attitude of "whatever I need to do to get well," and has accepted all help available to him.

Mr. Moore committed to using this case and the support Pretrial Services provides as a turning point in his life. He has been on Pretrial Services supervision since December of 2021, with only one violation. That violation was for alcohol use after he learned that his father died. *See* Dkt. 47. He was candid with his Pretrial Services Officer when this has happened and immediately invested additional time and effort in treatment. *Id.*; *see also* Sentencing Recommendation, at 4 ("He did recently relapse and used alcohol; however, he was honest about his use, did not minimize the risk associated with it, and sought help from his counselor.") With treatment, supervision, and support, both of which probation with extended home detention or incarceration provide, he does not pose a danger to the community.

Incarcerating Mr. Moore at this point would be counterproductive because it would remove him from treatment and place him in an environment certain to exacerbate his post-traumatic stress disorder, depression, and anxiety. His arrest and prosecution have deterred him and imprisoning him would not provide additional deterrent benefit. A publication by the U.S. Department of Justice's National Institute of Justice describes scientific findings about deterrence efficacy supports this. Ex. 5.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 4

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Three research observations are particularly relevant to Mr. Moore's case:

> **1. The *certainty* of being caught is a vastly more powerful deterrent than the punishment.**
> Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.
>
> **2. Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.**
> Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment.
>
> See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on prison as an ineffective deterrent.
>
> **4. Increasing the severity of punishment does little to deter crime.**
> Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes.
>
> More severe punishments do not "chasten" individuals convicted of crimes, and prisons may exacerbate recidivism.
>
> See "Understanding the Relationship Between Sentencing and Deterrence" for additional discussion on the severity of punishment.

Ex. 5.

**B.     Avoiding unwarranted disparity**

While the defense acknowledges the similarities Probation observes between Mr. Moore's case and *United States v. Jackson*, CR20-148-JLR, that case is meaningfully distinguishable. Most notably: (1) Mr. Jackson was initially charged with Arson, which carries a five-year mandatory minimum sentence, and had already received the benefit of that charge being dismissed due to his guilty plea;[3] (2) Mr. Jackson was only on bond for roughly six months prior to sentencing, part of which was spent in inpatient

---

[3] CR20-148-JLR, Dkts. 7 (indictment) and 44 (plea agreement).

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 5

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

treatment,[4] so the sentencing court could not have the same confidence that he could be safely and effectively supervised in the community as this Court can with Mr. Moore; (3) the sentencing record reflected that Mr. Jackson at times failed to follow through with mental health treatment,[5] which contrasts starkly to Mr. Moore's openness, vulnerability, and commitment to addressing his mental health.

Mr. Moore's personal history and characteristics, and particularly the direct connection between his now-treated mental health conditions and his offense, make his case unique. Given that uniqueness, sentencing Mr. Moore in accordance with the defense sentencing recommendation would not create *unwarranted* disparity.

Although not directly comparable, two sentences from the Eastern District of New York support the defense's recommendation by demonstrating that, even in cases that involved arson during the racial justice protests of 2020, lengthy prison sentences are not always necessary to achieve 18 U.S.C. § 3553(a)'s aims. In *United States v. Mattis*, and *United States v. Rahman*, the sentencing court imposed sentences of 12 months and one day, and 15 months, respectively. E.D.N.Y. Case No.: 20-cr-00203-BMC, dkts. 123 and 125 (amended judgments entered February 2, 2023). That case involved two attorneys who used a Molotov cocktail to burn a police car in May of 2020. The case, including the sentences imposed, received wide press coverage[6] and

---

[4] *Id.*, dkts. 22 (temporary release to inpatient treatment on September 24, 2020); 33 (appearance bond entered on November 10, 2020); 56 (March 29, 2021 sentencing).

[5] *Id.*, dkt. 51, at 2 (defense sentencing memorandum) ("Well before May 30, 2020, Kelly Jackson had been diagnosed as suffering from bipolar disorder and had been treated for it. Unfortunately, he did not maintain his medication, which is often the case with immature, mentally ill individuals.")

[6] *See, e.g.*, Hurubie Meko & Rebecca Davis O'Brien, During George Floyd Protests, 2 Lawyers' Futures Went Up in Flames, THE NEW YORK TIMES (January 26, 2023) (available at: https://www.nytimes.com/2023/01/26/nyregion/lawyers-sentenced-molotov-police-car.html); Brian Vitagliano and Alaa Elassar, Former lawyer who threw a Molotov cocktail at an NYPD vehicle during a police brutality protest has been sentenced to 15 months in prison, CNN Online (November 18, 2022) (available at:

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 6

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

would likely be known to anyone following cases arising out of the racial justice protests and aware of Mr. Moore's case. Sentencing Mr. Moore according to the defense's recommendation would, thus, not create public perception that he received unwarranted or disparate lenience. The length of the defense's home detention or incarceration recommendation of at least 12 months is based upon the custodial terms imposed in this case. Since Mr. Moore did not commit arson, imposing his sentence as home confinement or incarceration rather than BOP incarceration would not create unwarranted disparity with the *Mattis* and *Rahman* cases.

### C. Mr. Moore's personal history and characteristics; Providing medical and mental health treatment in the *most effective* manner

Mr. Moore needs both medical care and mental health treatment care to address post-traumatic stress, depression, and anxiety arising out of trauma he endured during his childhood and military service. Ex. 1; Ex. 6. All indications are that he will need both on an ongoing basis in the coming years, and likely the rest of his life. He has established relationships with medical and mental health care providers in the community through the Department of Veteran's Affairs (VA). Mr. Moore is receiving high quality care through the VA and he could continue in that care while under home confinement or incarceration. His quality of care would plummet in BOP custody.

Both medical and mental health care in the Bureau of Prisons are tragically lacking. People rarely receiving routine mental health care while imprisoned, and the BOP remains overly reliant on using restrictive housing for imprisoned people with mental illness (in some cases for months). *See, e.g.*, Ex. 2 (Thompson, Christie &

---

https://www.cnn.com/2022/11/18/us/lawyer-molotov-cocktail-protest-prison-sentence/index.html); Shayna Jacobs, Lawyers accused of throwing molotov cocktail in NYPD vehicle during protest to be released on bail, The Washington Post (June 30, 2020) (available at: https://www.washingtonpost.com/national-security/lawyers-accused-of-throwing-molotov-cocktail-in-nypd-vehicle-during-protest-to-be-rereleased-on-bail/2020/06/30/a2df319c-bb26-11ea-bdaf-a129f921026f_story.html)./

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 7

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Eldridge, Taylor Elizabeth; Treatment Denied: The Mental Health Crisis in Federal Prisons, THE MARSHALL PROJECT) (November 21, 2018); Ex. 3 (Executive Summary of OIG Report: "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness) (July 2017) (full report available at: https://oig.justice.gov/reports/2017/e1705.pdf).

The picture when it comes to medical care is no better. Another Inspector General report described:

> The BOP is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure. As part of this mission, the BOP provides medical care to federal inmates. Federal inmates receive medical care through institution health units or outside medical providers. In FY 2014, the BOP employed 3,215 medical staff…However, many institutions remain understaffed, limiting the amount of care that an institution can provide. Specifically, in FY 2014, 20 BOP institutions had a medical staff vacancy rate of 25 percent or higher and 3 institutions had a vacancy rate of 40 percent or higher. Hiring the medical professionals necessary to maintain the care that institutions must provide has proved challenging for the BOP.

*Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, March 2016, p. 2 (full report available at: https://oig.justice.gov/reports/2016/e1602.pdf) (Executive Summary attached as Exhibit 4). The report also noted that "12 BOP institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as *crisis level*." *Id.* at i (emphasis added).

The current picture for medical and mental health staffing in within the BOP is almost certainly worse than even these reports document. Both reports predate the COVID-19 crisis, which exacerbated conditions within the BOP and worsened the staffing crisis. In the defense's experience since that time, clients have had less access to medical and mental health care than prior to the pandemic due to staffing shortages.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

This is particularly concerning for someone in Mr. Moore's medical position. He is still undergoing medical diagnostic procedures. Although the defense hoped that the sentencing continuances granted thus far would allow Mr. Moore to have a clear diagnosis and treatment plan, that process is proving more complicated than hoped. In counsel's experience, clients who enter BOP custody without clear diagnoses routinely experience long delays in diagnostic care, when then delays medical treatment.

## IV.    CONCLUSION

Sentencing Mr. Moore to probation with a lengthy term of home confinement or incarceration is a sufficient sentence that would not create sentencing disparity given his unique circumstances and needs. Incarcerating him now would be counterproductive to community safety because it would destabilize him and remove him from mental health treatment that is currently addressing concerns underlying his offense. Moreover, if Mr. Moore were to violate probation, the Court would be able to sentence him to any sentence up to the ten-year statutory maximum. Knowing this will continue to motivate Mr. Moore and act to reassure the Court and the public that Mr. Moore will only remain in the community if he continues to earn the ability to do so through hard work, commitment to treatment, and compliance with all supervision conditions.

DATED this 7th day of September 2023.

Respectfully submitted,

s/ *Vanessa Pai-Thompson*
Assistant Federal Public Defender
Attorney for Justin Moore

DEFENSE SENTENCING MEMORANDUM
(*United States v. Moore*, CR22-013-LK) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100